**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON**

**PHILLIP WAYNE STOVER,**

       **Plaintiff,**

**vs.**                                             **CASE NO. 3:15-cv-06269**

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security,**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before this Court is Plaintiff's Brief in Support of Complaint (ECF No. 9), the Commissioner's Brief in Support of Defendant's Decision (ECF No. 10) and Plaintiff's Reply to Brief in Support of Defendant's Decision (ECF No. 12).

<u>Background</u>

On April 13, 2012, Phillip Wayne Stover, Claimant, applied for disability and disability insurance benefits (DIB) and social security income (SSI), alleging disability beginning March 7, 2012. The claim was denied initially on October 23, 2012, and upon reconsideration on December 17, 2012. Claimant filed a written request for hearing on December 27, 2012. Thereafter, on January 8, 2014, Claimant appeared at a hearing held in Charleston, West Virginia, before an Administrative Law Judge (ALJ). On January 24, 2014, the ALJ denied Claimant's applications for disability under sections 216(i) and 223(d) of the Social Security Act (Tr. at 201). On March 26, 2014, Claimant requested review of the hearing decision by the Appeals Council (AC)

asserting "The ALJ['s] decision is not supported by substantial evidence and is inconsistent with the evidence of record.  (Tr. at 280).

On July 1, 2014, by Notice of Order of Appeals Council the ALJ's decision was remanded (Tr. at 207).  The Order of Appeals Council directed the ALJ to resolve the issue that "The hearing decision is inconsistent in identifying severe visual impairments of visual disturbances and diabetic retinopathy, yet finding no corresponding visual limitations in the claimant's residual functional capacity evaluation" (Tr. at 208).  The Appeals Council (AC) ordered that upon the remand the ALJ will "Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rational with specific references to evidence of record in support of the assessed limitations." (*Id.*)  Additionally, the AC directed the ALJ to:

> Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 96-9p).  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.  The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966).  Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and the information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p) (Tr. at 208-209).

A supplemental hearing was held on October 10, 2014 (Tr. at 30-72).  On November 6, 2014, the ALJ denied Claimant's applications. On November 12, 2014, Claimant filed a request for review of the hearing decision by the Appeals Council (AC).  On March 9, 2015, the Appeals Council denied Claimant's request for review (Tr. at 1-4).  The Notice of Appeals Council Action stated "We found no reason under our rules to review the Administrative Law Judge's decision"

(Tr. at 1).   Thereafter, Claimant filed the instant complaint with this Court for judicial review, objecting to the final decision of the Commissioner and seeking reversal of the ALJ's decision.

<u>Standard of Review</u>

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2015).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  *Id.* § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  *Id.* § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  *Id.* § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   *Id.* § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  *Id.*  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  *Id.* § 404.1520(e).  By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.  *Hall v. Harris,* 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 404.1520(f) (2015).  The

Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, as the Claimant does in asserting that as a result of his stroke he experiences difficulties in maintaining concentration, persistence or pace, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

*(c) Rating the degree of functional limitation.*

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

4

(3)     We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4)     When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none"or "mild"in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date of March 7, 2012, and meets the insured status requirements of the Social Security Act through September 30, 2017 (Tr. at 10). Under the second inquiry, the ALJ found that Claimant suffers from the severe impairment of type II diabetes mellitus, cerebral thrombosis, diabetic retinopathy, third nerve palsy of the right eye, diabetic macula edema, cerebrovascular accident (CVA), late effects of CVA, depression and organic disorder (Tr. at 11). At the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the level of severity of any listing in Appendix 1. (*Id.*) The ALJ then found that Claimant has a residual functional capacity to perform work at the sedentary exertional level[2] (Tr. at 13). The ALJ held

---

[2]  The ALJ found that Claimant can lift and carry ten pounds occasionally and less than ten pounds frequently, can stand/walk for two hours in an eight-hour day, sit for six hours in an eight-hour day and requires a single cane for

that Claimant could perform unskilled sedentary work in the national economy in jobs such as: security monitor, grader/sorter and handpacker (Tr. at 22-23). On this basis, benefits were denied (Tr. at 23).

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is not supported by substantial evidence.

<u>Claimant's Background</u>

---

walking on uneven terrain only, due to visual and balance difficulties. He can never perform climbing of ladders, ropes or scaffolds due to visual and balance difficulties, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He has visual limitations that would preclude work requiring excellent depth perception (based on medical expert's testimony). He should avoid all exposure to hazards (heights and machinery), and concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise (level three-business) and vibration due to visual and balance difficulties. He is limited to simple repetitive, routine tasks and is able to adapt to routine and simple changes in task assignments (Tr. at 13-14).

Claimant was born on June 9, 1969 (Tr. at 35). He graduated from high school. He has his driver's license but he does not drive. He obtained his driver's license before having a stroke on March 7, 2012. Claimant uses a ramp at his home along with handrails (Tr. at 193). He lives with his mother. (*Id.*)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ did not consider all of the Claimant's conditions and symptoms when determining his residual functional capacity (RFC) (ECF No. 9). Claimant argues that the ALJ failed to properly analyze opinion evidence of Claimant's treating physicians and the combined effect of Claimant's impairments. Claimant asserts that the Commissioner's decision is not supported by substantial evidence in light of the record as a whole. Defendant avers that substantial evidence supports the ALJ's RFC evaluation, assessment of the opinion evidence and analysis of the Listings (ECF No. 10). Additionally, Defendant asserts that Claimant "identifies no other prejudicial error with the ALJ's decision." (*Id.*)

Medical Record

This Court adopts the medical record findings asserted by Claimant and by Defendant, to the extent as follows (ECF Nos. 9 and 10):

> Plaintiff was diagnosed with type II diabetes prior to the relevant period (Tr. 450, 556, 702). On March 8, 2012, Plaintiff described to Enrique Sta Ana, M.D., dizziness and double vision, also known as diplopia (Tr. 469, 705). Plaintiff was admitted to the Charleston Area Medical Center, where his care providers found his extraocular movement intact except that he could not look medially with his right eye (Tr. 469). His eyelid also exhibited some drooping, though Plaintiff had grossly normal strength in his upper extremities; his head was normocephalic and atraumatic; and his visual acuity was 20/40 bilaterally (Tr. 469-70). Plaintiff's care providers suspected possible third nerve palsy (Tr. 470). The following day, Plaintiff reported to Muhib Tarakji, M.D., that he had to hold his right eye open to see out of it; Dr. Tarakji found ptosis (drooping) in Plaintiff's right upper eyelid and characterized

8

Plaintiff's condition as "like a mini stroke in the eye" (Tr. 529, 532). Dr. Tarakji further opined that, "Since [Plaintiff] is an armed guard, [I] do not think he will be able to work right now, unless he does a desk job" (Tr. 532).

Plaintiff returned to the Charleston Area Medical Center one day later, reporting ongoing symptoms of blurred vision, dizziness and headache (Tr. 450). Plaintiff also continued to exhibit third nerve paralysis in his right eye (Tr. 454). A CT of Plaintiff's head showed a subtle low attenuation in his midline midbrain; a brain MRI showed an acute infarct, with minimal chronic changes; and a head MRI showed fetal-type circulation on the left side, with a 4-millimeter segment of stenosis (Tr. 455, 460-62). Plaintiff was discharged home on March 14, 2012, and his care providers diagnosed him status-post acute cerebrovascular accident (CVA), or stroke; diabetes; hypertension; hyperlipidemia; and dizziness (Tr. 457-58).

Several days later, Dr. Tarakji reported that Plaintiff had swelling and bleeding in the back of the eye (Tr. 536). Dr. Tarakji further opined that Plaintiff might need laser treatment (Tr. 536). Several weeks after Dr. Tarakji's examination, R. Mark Hatfield, M.D., opined that it was fortunate Plaintiff had developed partial third nerve palsy, since he also was experiencing significant proliferative retinopathy, particularly on the right side (Tr. 557). Accordingly, Dr. Hatfield stated, had the condition not been caught in a timely manner, it might have been sight-threatening (Tr. 557).

By April 12, 2012, Plaintiff reported to Joby Joseph, M.D., that the symptom was improving (Tr. 665). Dr. Joseph reported that Plaintiff's motor, sensory, and cerebellar function was unchanged, though Plaintiff was unable to perform tandem walking (Tr. 665). Plaintiff thereafter underwent right-eye laser surgery on April 24, 2012, at which time Plaintiff's uncorrected ("sc") vision was $20/60^{+2}$ on the left side and $20/30^{-3}$ on the right (Tr. 558). Dr. Hatfield reported six days later that diplopia was still present, but Plaintiff had experienced gradual improvement (Tr. 559). Dr. Hatfield opined at that time that, "In view of his current visual status, particularly with the diplopia issues, he is currently unable to work" (Tr. 559). Dr. Hatfield also relayed his hope that Plaintiff's "visual status will sufficiently stabilize to render his return to work in the next several months" (Tr. 559). Plaintiff underwent additional left-eye laser surgery in May 2012 (Tr. 560-61).

By July 2012, Plaintiff continued to complain of double vision, with headaches and floaters in his vision (Tr. 563). Consultative examiner Kip Beard, M.D., reported that Plaintiff ambulated with a cane, and his gait was a little slow and mildly wide-based, but Plaintiff actually could ambulate without the cane, stand unassisted, and step up and down from the table with only mild difficulty (Tr. 506). Plaintiff also exhibited mild discomfort and tenderness in cervical spine range-of-motion testing, though his lumbar spine exhibited normal curvature; Plaintiff had no evidence of weakness on manual muscle testing; and his sensation was reportedly intact (Tr. 507). Plaintiff also could squat, heel-walk, toe-walk, and tandem walk with a mild imbalance (Tr. 508). Dr. Beard opined that Plaintiff should use a single handheld assistive device when ambulating on uneven or hazardous terrain (Tr. 508).

Several weeks later, Dr. Joseph found Plaintiff's cranial nerves II-XII grossly intact, and his motor, sensory, and cerebellar examinations were unchanged, though Plaintiff was unable to perform tandem walking at that time (Tr. 667). John Wiles, OD, also examined Plaintiff's eyes in August 2012, reporting that with time and therapy, Plaintiff's reported diplopia could further improve (Tr. 512).

On August 20, 2012, state-agency expert physician James Egnor, M.D., reviewed the entire medical record and opined that Plaintiff retained the residual functional capacity (RFC) to occasionally lift/carry 10 pounds and frequently lift/carry less than 10 pounds; stand/walk for 2 hours, and sit for 6 hours, per workday; occasionally kneel, crouch, crawl, balance, stoop, and climb ramps and stairs; never climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to extreme cold, extreme heat, vibrations, and hazards, such as machinery and heights (Tr. 124-25).

Several weeks later, Plaintiff complained of sadness, low frustration tolerance, and problems with memory, attention and concentration to Mareda Reynolds, M.A. (Tr. 515). Ms. Reynolds found Plaintiff's mood euthymic, with a broad and appropriate affect, fair insight, and adequate judgment (Tr. 517-18). Plaintiff exhibited a mild impairment in concentration/attention, but his persistence and pace abilities, as well as recent memory, were within normal limits; in immediate memory testing, he could recall 4 out of 4 objects; and his remote memory was adequate (Tr. 517-18). Ms. Reynolds diagnosed Plaintiff with depressive disorder, not otherwise specified (NOS), with a fair prognosis, and she

10

opined that Plaintiff was capable of managing his own benefits if they were awarded (Tr. 519-20).

On October 23, 2012, state-agency expert psychologist Holly Cloonan, Ph.D., reviewed the medical record and opined that Plaintiff exhibited a moderate restriction in his activities of daily living; mild difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence or pace (Tr. 122). She further opined that Plaintiff retained the mental RFC to understand and remember simple *and* detailed instructions; carry out instructions at an adequate pace once learned (though he would need extra time to familiarize himself with new tasks); could accept supervision and relate adequately to coworkers and the public; and could adapt to routine and simple changes in work assignments (Tr. 127). Dr. Cloonan also opined that Plaintiff was not able to travel independently, but this was not for psychiatric reasons (Tr. 127).

In the meantime, Plaintiff underwent additional laser surgery procedures in September and October 2012 (Tr. 568-69). He also continued to see Dr. Sta Ana, whose relevant-period records are largely illegible (*e.g.*, Tr. 708). In December 2012, Dr. Joseph assessed residual third cranial nerve palsy on the right side, with mild finger-to-nose and shin-to-heel ataxia on the right (Tr. 672).

On December 14, 2012, state-agency expert physician Caroline Williams, M.D., independently reviewed the record and affirmed Dr. Egnor's RFC opinion as written (Tr. 162). That same day, state-agency expert psychiatrist James Binder, M.D., independently reviewed the medical record and affirmed Dr. Cloonan's opinion of Plaintiff's limitations (Tr. 158), as well as Dr. Cloonan's opinion of his mental RFC (Tr. 163).

Several days later, Dr. Hatfield examined Plaintiff and found multiple right-eye macula with exudates and blot hemorrhages, as well as focal scars with some microaneurysms and blot hemorrhages on the left (Tr. 583). Dr. Hatfield diagnosed Plaintiff with persistent diabetic maculopathy, worse on the left; proliferative retinopathy, worse on the right but stable; and continuing subjective complaints of diplopia (Tr. 584). Dr. Hatfield added that, "In regards to his central and peripheral visual status, it was explained that Plaintiff would not meet any disability requirements" (Tr. 584-85).

By December 27, 2012, Dr. Tarakji found no ptosis in Plaintiff's right eye, with an only minimal limitation of adduction (Tr. 541). Plaintiff noted that he could open his right eye, and Dr. Tarakji found his third nerve palsy 95% better than before (Tr. 541). Plaintiff also reported that he could make his double vision go away for short periods of time, and Dr. Tarakji opined that his double vision should continue to get better (Tr. 539, 541). Overall, Dr. Tarakji opined that Plaintiff's recovery was good (Tr. 541). Plaintiff underwent an additional laser procedure several days later (Tr. 582).

On February 5, 2013, Dr. Sta Ana completed a form for the West Virginia Department of Health and Human Services indicating that Plaintiff could not perform full-time work for an indefinite period of time (Tr. 726). Later that month, Dr. Joseph noted that a repeat MRI had shown no present abnormalities (Tr. 669, 674). Dr. Joseph also found that Plaintiff's depression was adequately controlled (Tr. 669).

In the ensuing months, Plaintiff intermittently presented for eye examinations and visited Dr. Sta Ana for medication refills (Tr. 576, 715-16, 738). Plaintiff reported in June 2013 that he still had double vision, though he could bring the images together until blinking or moving his head (Tr. 734). Dr. Tarakji recommended, and performed, a Botox injection in Plaintiff's right eye to attempt to resolve his complaints of double vision (Tr. 736). Plaintiff underwent an additional laser surgery procedure in his left eye in August 2013 (Tr. 575).

By August 22, 2013, Plaintiff reported to Dr. Joseph that his double vision had improved (Tr. 745). Dr. Joseph found Plaintiff's cranial nerves intact; and his motor, sensory, and cerebellar examinations were unchanged, though Plaintiff could not perform tandem walking (Tr. 745-46). Overall, Dr. Joseph opined that Plaintiff's condition was clinically satisfactory (Tr. 746). The following month, Devin King, M.D., noted Plaintiff's history, including complaints of double vision related to third nerve palsy, a history of bleeding behind his eyes, as well as other physical and psychiatric complaints (Tr. 747-49). Dr. King found Plaintiff's visual acuity $20/30^{-1}$ on the right and $20/20^{-2}$ on the left (Tr. 749). However, he assessed clinically significant diabetic macular edema on the left side; and he recommended prism correction for Plaintiff's continuing diplopia complaints, for which he provided a prescription for new glasses (Tr. 750-51). Plaintiff later reported that the glasses helped with his double vision (Tr. 795). Dr. King also discussed the benefits of maintaining good

blood sugar control, and he further reported that Plaintiff's mood and affect were normal (Tr. 750-51).

Plaintiff returned to Dr. Hatfield in October 2013, complaining of seeing a black line on the right side, in connection with which Dr. Hatfield assessed a vitreous hemorrhage; as well as photopsias (flashes) for several days (Tr. 757). Dr. Hatfield recommended that Plaintiff refrain from bending or lifting (Tr. 760). By the following month, Plaintiff reported attempting to adhere to the vitreous hemorrhage precautions, and the line was more like a floater now, though it worsened in evenings (Tr. 762). By January 2014, Dr. Hatfield reported that while there was still proliferative activity in both eyes and a diffuse low-grade paracentral maculopathy, the vitreous hemorrhage had resolved (Tr. 787). Dr. Hatfield found that Plaintiff's visual acuity was $20/25^{-1}$ on the right and $20/20^{-3}$ on the left (Tr. 788).

On April 28, 2014, Dr. Joseph again found Plaintiff's cranial nerves intact; and his motor, sensory, and cerebellar examinations were unchanged, though Plaintiff could not perform tandem walking (Tr. 816). Two months later, Plaintiff denied visual acuity changes to Dr. Hatfield, who assessed his visual acuity at $20/25^{-1}$ on right and $20/25$ on the left (Tr. 806-07).

On August 13, 2014, Dr. Joseph completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form, in which he checked-off responses indicating that Plaintiff could sit for 4 hours without interruption, and for 2 hours total per workday; stand for 1 hour without interruption and in total; walk for 2 hours without interruption, and for 1 hour total per workday; needed a cane to ambulate; could occasionally reach, handle, finger, push and pull with his right hand (though Dr. Joseph declined to indicate any abilities or inabilities in connection with Plaintiff's left hand); could occasionally operate foot controls; could never climb, balance, stoop, kneel, crouch, or crawl; and could never be exposed to heights, moving mechanical parts, operating a motor vehicle, humidity, wetness, dusts, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and other things that he declined to identify (Tr. 817-21). Dr. Joseph also opined that Plaintiff could not ambulate without using a wheelchair, walker or 2 canes (Tr. 822). Dr. Joseph further opined that Plaintiff's vision was affected by his impairments, though, in lieu of specifying the degree of his limitations, Dr. Joseph wrote, "See ophthalmologist report" (Tr. 820).

13

Discussion

"RFC represents the most that an individual can do despite his or her limitations or restrictions." *See* Social Security Ruling 96-8p, 1996 WL 374184, *1 (July 2, 1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including "the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." *Id.* at *5. The Ruling requires that the ALJ conduct a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. This function-by-function analysis enables the ALJ to determine whether a claimant is capable of performing past relevant work, the appropriate exertional level for the claimant, and whether the claimant is "capable of doing the full range of work contemplated by the exertional level." *Id.*

Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545, 416.945 (2015). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." *Id.* "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* At *7.

The ALJ also must "explain how any material inconsistencies or ambiguities, in the evidence in the case record were considered and resolved." *Id.*

In *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations[3]." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." *Id.*

In determining a claimant's RFC, the ALJ must consider "'all of [the claimant's] medically determinable impairments of which [the ALJ is] aware,' including those not labeled severe at step two" of the sequential analysis.  Id. at 635.  The ALJ must "consider all [the claimant's] symptoms, including pain, and the extent to which [his] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."   See 20 C.F.R. §§ 404.1529(a), 414.929(a).   "When the medical signs or laboratory findings show that [the claimant has] a medically determinable impairment(s) that could reasonably be expected to produce [his] symptoms, such as pain, [the ALJ] must then evaluate the intensity and persistence of [the

---

[3]  The listed functions under Social Security Ruling 96-8p include:

> [T]he claimant's (1) physical abilities, "such as sitting, standing, walking, lifting, carrying,, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)"; (2) mental abilities, "such as limitations in understanding, remembering and carrying out instructions and in responding appropriately to supervision, coworkers and work pressures in a work setting"; and (3) other work-related abilities affected by impairments "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses and impairment(s) which impose environmental restrictions."  *Mascio*, 780 F.3d at 636 n.5.

claimant's] symptoms so that [the ALJ] can determine how [his] symptoms limit [his] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 414.929(c)(1).

The Fourth Circuit in *Mascio* noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. *Id.* The Fourth Circuit further noted that a *per se* rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" *Id.* Rather, the Fourth Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2 d Cir. 2013)); *see also*, *Ashby v. Colvin*, Civil Action No. 2:14-674 (S.D. W.Va. Mar. 31, 2015).

In the instant case, Claimant testified to having memory problems that he attributes to side effects from the brain stem stroke (Tr. at 94). His family members help remind him to take medications and attend doctors' appointments. Claimant testified to having trouble concentrating and staying on task due to "brain fog" (Tr. at 51).

The ALJ found that mentally, Claimant was limited to simple, repetitive, routine tasks and was able to adapt to routine and simple changes in task assignments (Tr.at 14). In making this assessment, the ALJ further found that Claimant had moderate limitations in maintaining daily activities; mild limitations in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration (Tr. at 12-13). Regarding concentration, persistence, or pace, the ALJ acknowledged the record indicates that Claimant "had difficulty with concentrating and focusing" (Tr. at 13). The ALJ

stated that "On the Cognistat examination[4], the claimant has mild impairment in construction and calculations." (*Id.*)

In assessing Claimant's RFC, the ALJ posed the following hypothetical questions to the Vocational Expert (VE):

ALJ:

Let's assume this hypothetical individual's date of birth is June 9, 1969, with a high school education with the following limitations, this hypothetical individual could lift 10 pounds occasionally, carry, lift and carry 10 pounds occasionally, less than 10 pounds frequently, stand and walk two hours in an eight hour work day, sit for six hours. This person must use a single cane for walking on only uneven terrain. Posturally this person can never climb ladders, ropes, scaffolds. The following are all occasionally, occasionally climb ramps, stairs, balance, stoop, kneel, crouch and crawl. Environmentally this person hypothetical individual must avoid concentrated exposure to extreme cold, extreme heat, wetness, noise, vibration, hazards, machinery and heights and psychologically this person is limited to simple, routine, repetitive tasks. Based on those restrictions can this hypothetical individual perform the claimant's past work as either as a laborer, security guard or screen washer?

VE:

We look at the past work, Your Honor, and the nature of the duties. None of the jobs would be suitable for various reasons pertaining to the hypothetical.

ALJ:

Would there be jobs, same hypothetical individual with the same limitations would there be jobs in the either national or regional economy that this person could perform?

VE:

Give me just a moment, sir. We consider a person capable of

---

[4] The Cognistat Paper test, formerly known as the Neurobehavioral Cognitive Status Examination (NCSE), is a cognitive screening instrument that assesses the five major ability areas: language, spatial skills, memory, calculations and reasoning. Cognitive assessment is a critical component of a diagnostic evaluation. It is a part of the mental status examination performed by psychiatrists and neurologists. See http://www.cognistat.com/about-exam-faq (last viewed on August 30, 2016).

essentially sedentary work looking at that hypothetical. I think there would be some jobs that we could consider. We could look at a variant of security work in the surveillance system monitor type setting where a person is working more at an unskilled level at a stationary location where they would be monitoring cameras and alerting authorities and that type of thing. They number an estimated 9,500 nationally and estimated 900 regionally and a representative DOT of 379.367-010. The region would include West Virginia, Virginia, Ohio, Kentucky and Pennsylvania.

***

ALJ:

Let me add a few additional, the same hypothetical individual, everything the same. We add on would the numbers change if we add on this person is able to adapt to routine and simple changes in task assignment and that this person is not able to travel independently. Would that change the job numbers or job that you have identified?

VE:

Sorry, Your Honor, you can speak faster than I write. I think if we look just at the factor of an individual being unable to travel independently it would severely hamper the opportunity for work and my interpretation of that being that a person would be unable to get from their primary residence to a place of employment without assistance.

ALJ:

So, what would that be?

VE:

I think that would eliminate any of the jobs that I –

ALJ:

The jobs you've identified.

VE:

--that I named if a person would be unable to travel independently to and from work.

ALJ:

How about able to adapt to routine and simple changes in task assignment alone?

VE:

> Yes, Your Honor, I think that as well, they both are significant limitations and if a person is unable to even have the flexibility in simple situations that while it wouldn't be a situation that would prevent a person necessarily from getting a job it could be a significant impairment to them keeping a job just from failure to have task persistence on an adequate basis day-to-day.

ALJ:

> So either the, it's independent so based on the hypothetical if we add this hypothetical individual is only able to adapt to routine and simple changes in task management that would eliminate the job or if this individual is not able to travel independently that would eliminate the job.  Is that your testimony.

VE:

> Unable to adapt, did you say able?

ALJ:

> No, able, to routine in simple changes in task assignment.

VE:

> If they're able to in simple entry level unskilled jobs, adapt, I'm sorry, I misunderstood able and unable.  Able, I would not change alone but the inability to travel independently—

ALJ:

> That eliminates--

VE:

> That would be the factor in my opinion that would eliminate the job.

ALJ:

> But the, if this person is able to adapt to routine and simple changes in task assignment would there be any changes in the numbers that you have identified?

VE:

> Not in my opinion.  We're looking at simple entry level jobs. (Tr. at 104-108).

In *Mascio*, the Fourth Circuit held that an ALJ does not account "for a claimant's

limitations in concentration, persistence, and pace by restricting the hypothetical question to

simple, routine tasks or unskilled work." *Mascio*, 780 F.3d at 638. The Fourth Circuit reasoned that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitations in concentration, persistence, or pace." *Id.* Consistent with the facts in *Mascio*, the ALJ here failed to account for Claimant's limitations in maintaining concentration, persistence, or pace. The ALJ failed to explain the exclusion of the specific moderate limitations in his hypothetical question to the VE. Accordingly, the undersigned respectfully recommends that the District Judge find that the ALJ failed to properly account for Claimant's limitations in concentration, persistence and pace by either including a limitation for Claimant's ability to stay on task in the hypothetical to the Vocational Expert or explain the exclusion of the limitation.

Additionally, the ALJ held that "Despite the complaints of allegedly disabling visual impairment symptoms, the claimant has not taken any medications for those symptoms" (Tr. at 17).   Defendant asserts "Plaintiff's use of medication, or the references in the record to his symptoms having improved (e.g., Tr. 745, 787, 795), were obviously relevant to the ALJ's analysis of the extent of the limitations Plaintiff experienced in the years following his AOD [alleged onset date]; and the ALJ cited them accurately (Tr. 17)" (ECF No. 10).

Claimant asserts that following discharge from the hospital[5] after he suffered a brain stem stroke and third nerve palsy in the right eye, he "followed his prescribed course of treatment thereafter" (ECF No. 9).   Claimant testified to seeing his neurologist "on a regular basis" and taking "a whole fistful of medicine" every day, including Heparin[6] and Plavix[7] (Tr. at 84).  He testified "The neurologist thought that everything just got tight from the stroke so… for a while

---

[5]  Claimant testified that he stayed approximately six days in the hospital following his stroke (Tr. at 84).

[6]  Herapin is an injectable blood thinner.

[7]  Plavix is used to prevent blood clots after a recent heart attack or stroke.

he prescribed muscle relaxers or something" (Tr. at 109).

Claimant testified that he followed the treatment for his right eye as given by medical professionals that included eye exercises and multiple surgeries. Claimant testified that his doctor has prescribed glasses to help Claimant's double vision (Tr. at 87). He stated that the glasses help with the double vision when he is looking straight ahead, however, if he looks to the left or to the right without moving his head he has double vision (Tr. at 89). Claimant testified that he tried mowing the lawn with a riding mower subsequent to the stroke and fell off the lawn mower (Tr. at 95). He testified to still receiving treatment from physicians regarding his eye sight in his right eye (Tr. at 90).

The ALJ failed to explain his statement about Claimant's lack of medications. It is hard to know what the ALJ meant by this finding. The ALJ did not provide a narrative discussion explaining how Claimant's lack of medications for his vision impairment demonstrates that Claimant's allegations are not severe. Claimant has had numerous surgeries on his right eye and testified to taking medications. The ALJ failed to explain the inconsistencies in the record. The undersigned respectfully recommends that the District Judge find that inadequacies in the ALJ's analysis frustrate meaningful review.

<u>Pain</u>

A two-step process is used to determine whether a claimant is disabled by pain. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain alleged. 20 C.F.R. § 404.1529(b) (2015); SSR 96-7p, 1996 WL 374186 (July 2, 1996); *see also*, *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated. *Craig*, 76 F.3d at 595. When a claimant

21

proves the existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994).  Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.  *Hyatt v. Sullivan*, 899 F.2d 329, 337 (4th Cir. 1990).   A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. § 404.1529(c)(4) (2015).

Additionally, the regulations provide that pain is properly assessed when the following seven factors have been considered.

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.  .  .  .   Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3) (2015).

Claimant testified to experiencing pain on a regular basis.  He stated that he has headaches two or three times a week and pain in his neck daily (Tr. at 108-109).  Claimant testified that the pain is distracting (Tr. at 109).

*Craig* provides that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. *Craig*, 76 F.3d at 585, 594.  For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain.  *Craig*, 76 F.3d at 595.  Nevertheless, *Craig* does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision.  The only analysis which *Craig* prohibits is one in which the ALJ rejects allegations of pain *solely* because the pain itself is not supported by objective medical evidence.

Claimant asserts that "Although the ALJ recites most of the Claimant's testimony, he fails to account for the claimant's inability to stay on task during an 8 hour workday" (ECF No. 12).  Claimant argues that his pain affects his ability to stay on task during a regular work week.  In addressing Claimant's alleged symptoms, the ALJ states "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements

23

concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision" (Tr. at 15). However, upon a close review of the entire decision, the ALJ failed to appropriately account for the reasons that were considered and an explanation for those reasons.

"In all cases in which symptoms, such as pain, are alleged, the RFC assessment must… [i]nclude a resolution of any inconsistencies in the evidence as a whole" and "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." See SSR 96-8p, 61 Fed. Reg. at 34,478.

In the present matter, the ALJ commented on Claimant's assertions regarding his visual impairment and symptom of pain. However, the ALJ failed to contest any of Claimant's assertions except for the one instance in Claimant's testimony that he is "blind for a few minutes" when going from darkness to bright lights. The ALJ found that Claimant's statement was inconsistent with Dr. Shaffzin's statement.

The ALJ stated:

> The description of the symptoms and limitations, which the claimant has provided throughout the record has generally been inconsistent and unpersuasive. For instance, the claimant testified he is "blind for a few minutes" when going from darkness to bright lights. Dr. Schaffzin stated an individual may need a "few seconds" to adjust from darkness to bright light, but not a "few minutes" as reported by the claimant (Tr. at 18).

Claimant argues that the ALJ only gave one example of inconsistency (ECF No. 9). Further, Claimant states that "While Mr. Stover is not the best historian while testifying about the extent of his symptoms, there is no evidence that his description of his symptoms and limitations are inconsistent and unpersuasive." (*Id.*)

Of all of Claimant's assertions regarding his visual impairment and symptoms of pain, this one inconsistency in words chosen to describe the length of time for eyes to adjust when going

from darkness to bright lights is by itself an insufficient explanation as to the ALJ's conclusions on finding Claimant's description of symptoms and limitations "inconsistent and unpersuasive." (*Id.*)

Accordingly, the undersigned respectfully recommends that the District Judge find that ALJ did not properly assess Claimant's pain with the seven factors listed under 20 C.F.R. § 404.1529(c)(3) (2015).  Also, the undersigned proposes that the District Judge find that ALJ did not evaluate and explain the effects Claimant's pain would have on his ability to work pursuant to the holding in *Craig*.

Conclusion

For the reasons stated above, the undersigned respectfully recommends that District Judge find that the ALJ failed to: properly to account for Claimant's moderate limitations in maintaining concentration, persistence, or pace when he assessed Claimant's RFC; explain the inconsistencies in the record; and properly assess Claimant's pain with the seven factors listed under 20 C.F.R. § 404.1529(c)(3) (2015).   This Court makes no recommendation as to Claimant's remaining arguments.  These issues may be addressed on remand. The undersigned respectfully recommends that the presiding District Judge remand this matter for further analysis and consideration.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Plaintiff's Brief in Support of Complaint (ECF No. 9) to the extent Plaintiff seeks remand[8], **DENY** the Brief in Support of Defendant's Decision (ECF No. 10), **REVERSE** the final decision of the Commissioner, and **REMAND** this case for further

---

[8] Claimant requests this Court reverse this matter in Petitioner's Brief in Support of Complaint (ECF No. 9), however, Claimant requests this Court reverse and remand this matter in Petitioner's Reply to Defendant's Brief in Support of Defendant's Decision (ECF No. 12).

proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the District Judge Robert C. Chambers.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Chambers and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter:  August 31, 2016

Dwane L. Tinsley
United States Magistrate Judge